68  523
91  260

OLUF A. THORSEN v. SIMEON BABCOCK AND MICHAEL ENGELMANN.

*Negligence—Special findings of jury.*

1. It is a familiar and necessary rule of law that the only negligence which creates responsibility is that which has caused the mischief done, and there is always danger that redundant charges, if allowed to be proved, will not only confuse the *real* issues, but may, and generally do, lead to convictions not based on the *real* charge.

2. In this case the answers of the jury to the special questions submitted to them are held to *negative*, not only the *case* made by the declaration, but also any agency of defendants in plaintiff's going into the place of danger where he received the injuries complained of, and to have entitled defendants to judgment on such special findings. An examination of the entire opinion is essential to a correct understanding of the case.

Error to Manistee. (Judkins, J.) Argued October 20, 1887. Decided March 2, 1888.

Case. Defendants bring error. Reversed. The facts are stated in the opinion.

*Ramsdell & Benedict,* for appellants.

*Smurthwaite & Glassmire,* for plaintiff.

CAMPBELL, J. The plaintiff, who, at the time of the

injury he received, was twelve years old, sued defendants for
the loss of his arm in November, 1886. The injury occurred,
so far as the record explains it, in this way: Defendants own
a shingle-mill in Manistee. Connected with it is a sawdust
carrier, by which the sawdust and small refuse are carried
by an endless chain arrangement into a room constituting a
large box or bin on the outside, with a hopper or trap-bottom
through which the sawdust thrown into the box is dropped
into carts to be removed as fast as a load is ready to be
dumped. This carrier came into the north-east corner of the
box, revolving about an iron shaft three feet long between
the bearings, as shown by the scale; one bearing being on the
east side in the frame of the box and the other being on a
cross-beam running across the box from the mill side on the
north to the front on the south. The carrier extended in a
trough about four feet, including the outer limit of the
wheels or pulleys, which seem to be about a foot in diameter.
The gudgeon where it reached its bearing on the cross-beam
was held in place by a collar, apparently about six inches in
diameter, fastened on the shaft by a set-screw, the head of
which projected from half an inch to an inch above the rim
of the collar, according to plaintiff's witnesses, and rather
less according to some others.

Plaintiff usually entered this box (where he was employed
in keeping the sawdust from piling under the carrier) by a
hole in the west end, not very far from the bottom. This
hole he sometimes closed to keep the wind out. The trap,
opened to let out the sawdust, was in the middle of the
front, which seems to be about 10 feet wide; the box being a
foot or so narrower the other way. The pictures and plans
in the record show some other openings in the upper part of
the box, one at the east end opening on a roof, which was
used when plaintiff came for signaling, and one of consider-
able size west of the middle of the box, caused by a board
being blown off while plaintiff was there, from which plaint-

iff testifies he looked out to signal the cartmen to take away the sawdust, which was dropped into their carts through the trap opened for that purpose from the outside.

Plaintiff was employed in July, 1886, and his duty was, by means of a long stick with a hook upon it, to keep the sawdust spread out so as not to pile up high enough to get caught by the carrier on its return to the mill. The sawdust thus dropped into the sloping bottom, and when enough accumulated the load was dumped into the cart below.

On the fifteenth of November, after he had been working there four months, plaintiff, for some purpose, got up on the cross-beam, on which the end bearings of the carrier shaft revolved upon a raised block, and walking or in some way passing along there, or slipping and falling,—for there is some obscurity on this point,—his coat became entangled on the shaft, and, as is claimed, was caught by the revolution of the collar and raised set-screw head so that he was drawn down until his arm was caught, and was carried round some four revolutions, when his coat gave way and he fell off into the sawdust below, having his left arm so badly broken that it had to be amputated at the shoulder. His cries drew attention to him, and he was taken out at the bottom of the box, through which he had run his legs, but was unable to get out without lifting, which was done by two men engaged about the mill.

The theory of the suit was that plaintiff had been injured by the fault of defendants, the mill-owners, and not by accident or by his own conduct outside of his duty. The declaration set out several items of what was relied on to make out the fault of defendants. The jury found a verdict for plaintiff, with several special findings that are claimed to negative plaintiff's cause of action as averred. And it is claimed, further, that the testimony apart from the finding does not support the alleged cause of action. In one form or another the burden of the charge was that plaintiff was

injured in the discharge of his duty by causes which defendants were legally bound to prevent.

The declaration sets out at considerable length a good many duties, and what are claimed to have been violations of them. This is well enough perhaps as a recital, but it is a familiar and necessary rule of law that the only negligence which creates responsibility is that which has caused the mischief done, and there is always danger that redundant charges, if allowed to be proved, will not only confuse the real issues, but may, and generally do, lead to convictions not based on the real charge. The present case to some extent illustrates the danger, as time was spent on side issues unprofitably, and the jury, by their own statement in open court, could not reconcile the allegations and the proofs. It may, however, be proper to point out some of these allegations, all of which were allowed to go to the jury as real issues.

After setting forth in a general way the alleged duty to provide a safe place of work accessable to succor, and to provide safe machinery properly guarded, and to avoid exposing plaintiff to danger which he could not be expected to guard against, the declaration set out in what manner this duty had been disregarded.

It set forth first that plaintiff was required to pull away sawdust and shavings from the carrier, the construction of which was described specifically, and referring to the cross-beam on which the shaft rested as near the hole for signaling the drivers, and it further gave a general description of the way in which the sawdust was dumped. It then proceeded to set forth what was required of plaintiff in this way:

" The services so required by said defendants of said Oluf A. Thorsen, at the time aforesaid, were to climb up the side of said mill and enter said box near the lower side thereof through a small hole, there being no means whatever of enter-

ing or leaving said box other than the trap-door aforesaid, and the place where the said Oluf A. Thorsen was required to enter the same as aforesaid; and when the said Oluf A. Thorsen was within the said box he was required to close up the said small hole in the said box to prevent the said sawdust, shavings, and refuse from running out thereat, thus placing him alone in his employment, and beyond the reach and assistance of any person whatever; and by reason of the negligent and improper construction of said box, the said trap-door being fastened and opened only from the outside, and there being no other opening therein, there was no means of escape for the said Oluf A. Thorsen from said box, or from any danger that might arise therein."

It then sets out that, by reason of the negligent construction of the box, none of the employés of the mill could see him or hear any outcries he might make.

The next series of allegations state that he was required, in order to prevent the carrier from dragging back the sawdust, etc., to pull it away and scatter it in the box till nearly full, and till this stuff was higher on all sides of the box than where the carrier deposited it, and then to climb up to the cross-beam, back of where the shaft revolved, that being the only place where it was possible for him to reach the cross-beam, and then proceed along that beam over the place where the shaft revolved, and over and past the collar, and up to the front of the box to the signaling hole, and there to signal the carts, and wait on the beam till they had opened the trap and emptied the box and fastened it up again, when he would get down and proceed as before. It then averred that the machinery was not covered or protected, and no means were provided for climbing to the beam except the braces and timbers of the box, which made it dangerous. It further averred that the set-screw was improperly allowed to project two inches, and was dangerous.

These being the acts of negligence relied on, the declaration went on to describe the injury as occurring in this way: That plaintiff, having pulled away the sawdust, shavings,

and refuse until said box was full and sloping towards said sawdust carrier, so that he was in great danger of slipping down into the same, proceeded with care and diligence to climb over said sawdust, shavings, and refuse, and up the side of said box to the said cross-beam, and thence along the same to the signaling hole, for the purpose of signaling the carts, and when over the collar and set-screw, the screw projecting and revolving caught in his coat and became fastened therein, and immediately began to wind the coat on the shaft till it reached his left shoulder, and began to wind up his left arm, which was broken and mutilated, and whirled him around until he was disentangled by his feet striking the box. It is then averred that he cried out as soon as entangled, but by reason of the improper construction of the box no one could hear him, and had he been heard no one could have helped him, as the box was full and could not be entered without emptying it through the trap-door.

The immediate mischief is, by these allegations, reduced to this state of facts: That plaintiff had placed the sawdust in such a condition that the only place of entry was blocked up, and the box was full and sloping down towards the carrier with danger that plaintiff would slide into it; that it became necessary to climb over this heap and climb up on the cross-beam behind the shaft, and cross the shaft and revolving collar; and he was caught by the set-screw while doing so and hurt. As matter of further aggravation it is claimed that he could not be heard, and if heard could not be reached until the box was emptied by the trap-door; and his youth is also insisted on as requiring more care in his employment.

When the case went to the jury it was claimed that no cause of action was made out by the proofs; and certain questions were submitted to and answered by the jury, which it is claimed entitle defendants to judgment.

When the proofs were closed the matter was very much narrowed down, and the real questions of negligence became

very limited, although they were not separated as they might have been. There is no testimony that either the box or the machinery differed in any respect from what is usual, or involved any special risks, or that any safer methods were feasible. Except for the alleged necessity of plaintiff's continually climbing up and passing over the revolving shaft, there was nothing to create peril. There could have been no risk except in passing over the cross-beam at the spot where the shaft and collar revolved, and that was the only thing which, according to the testimony, had any bearing on the injury suffered. Plaintiff's cries were actually heard, and there is nothing to indicate that it would have been possible to rescue him sooner after he was caught by the machinery although it was not impossible to enter the box.

Looking at the testimony it appears that there was no occasion for the plaintiff to go upon that beam as he did unless he chose to. The hole which he signaled from, which was reached by him on the beam, was not the one provided by defendants for that purpose, but was made by a board accidentally blowing off. The signaling place used by his predecessor and by himself until the board blew off was different, but with the record unexplained it is somewhat difficult to understand all of the testimony on this subject, or precisely what difference this made. But it appears from his own testimony that there was no occasion to signal until a load had accumulated in the box, and that at the time when this happened there was but a small quantity gathered, and it would have taken half an hour to fill up sufficiently for that purpose. Until this should be done, his place was at the western end of the box, where it was his duty to be, and rake off the dust as it fell from the carrier, so as to keep it from piling up where it fell. There was testimony of another boy, who plaintiff says was at the open end of the box when he was caught by the shaft, but who gives a rather different account; that he was idling and sitting down on the cross-beam over

68 MICH.—34.

the shaft. His own testimony shows that he was there when he had no business there.

Unless he was there under the circumstances alleged in the declaration, and was also required to be there, the case alleged is not made out either formally or substantially. But the undisputed testimony supports the findings, and shows that he was not.

The jury, after being out for six or seven hours, came in and announced that they could not agree, and that the reason was they could not get the declaration and the testimony together. This was substantially an indication that plaintiff's case was not made out. The court, however, sent them back with very strong urgency for an agreement before the next morning, and with the statement that they must stay together until they did agree. This, however, was probably meant to be simply till the court met at 9 the next morning. The jury during that time agreed on a sealed verdict for plaintiff, and were discharged. In answer to special questions they found as follows:

1. That plaintiff was not required to close up the hole where he entered in the west end.

2. That this hole and the trap-door were not covered so as to afford no means of communication with the box.

3. That plaintiff had no orders from defendants or their foreman to climb up and walk along the cross-beam, where the shaft revolved, to the hole in the front of the box, to signal drivers when the box was full.

4. That when the box was nearly full he could not reach that hole without going on the beam over the shaft and collar with its set-screw.

5. That the box was not full, so as to create any danger of slipping down towards the carrier.

In view of what has been already said these answers negative, not only the case made by the declaration, but also any agency of defendants in plaintiff's going upon this place of danger at any time. His own testimony is not very far from

the same effect, and the jury could hardly have found otherwise.

This being so, defendants were entitled to judgment in their favor on the special findings.

Judgment must be reversed, and judgment rendered here accordingly.

The other Justices concurred.